## CONTINUATION OF APPLICATION FOR SEARCH WARRANT

I, Marcel Behnen, being duly sworn, depose and state that:

### Introduction

1. I am a Task Force Officer with the United States Drug Enforcement Administration, United States Department of Justice, and have been so since March 2019. I have been a police officer with the Kalamazoo Department of Public Safety for about 14 years, the last 6 of which I have been assigned as an investigator with the Kalamazoo Valley Enforcement Team (KVET), which is tasked with investigating narcotics trafficking. I am currently assigned to the Grand Rapids District Office in the DEA's Detroit Field Division. During my time as a KVET Investigator, I have participated in investigations of unlawful drug trafficking and, among other things, have conducted or participated in surveillance, the execution of search warrants, debriefings of informants, reviews of taped conversations and drug records, and have participated in investigations that included the interception of wire and electronic communications. Through my training, education and experience, I have become familiar with the manner in which illegal drugs are transported, stored, and distributed, the methods of payment for such drugs, the laundering of narcotics proceeds, and the dialect, lingo, and coded language used by narcotics traffickers. In connection with my duties, I investigate criminal violations of the Federal and State controlled substance laws including, but not limited to, conspiracy and attempt to possess with intent to distribute and to distribute controlled substances, in violation of 21 U.S.C. § 846; possession with intent to distribute and distribution of controlled substances, in violation of 21 U.S.C. §

841(a)(1); use of communication facilities to facilitate drug trafficking offenses, in violation of 21 U.S.C. § 843(b), conspiracy to commit money laundering, in violation of 18 U.S.C. § 1956(h) and money laundering, in violation of 18 U.S.C. § 1956(a)(1)(A)(i), 18 U.S.C. § 1956(a)(1)(B)(i), and 18 U.S.C.§ 1957.

2. I make this affidavit in support of an application under Rule 41 of the Federal Rules of Criminal Procedure for a search warrant authorizing the examination of the following electronic devices (collectively, the "**Subject Devices**") and their contents:

    a. **Subject Device 1**: Green iPhone 13, Model A2482, IMEI 35299173779102 in a black case.

    b. **Subject Device 2**: Black Tracfone Alcatel MyFlip2, Model A406DL, IMEI 016023003966300.

The **Subject Devices** were seized during the execution of a federal search warrant (1:22-mj-372) at 2717 Fairfield Ave, Kalamazoo, MI on August 26, 2022. **Subject Device 1** was seized from Bryce SALTER's person. **Subject Device 2** was seized from the closet shelf of the south bedroom ("Bedroom A") at 2717 Fairfield Ave. The **Subject Devices** are currently in the custody of the Kalamazoo Valley Enforcement Team (KVET) in Kalamazoo, MI.

3. The applied-for warrant would authorize the forensic examination of the **Subject Devices** for the purpose of identifying electronically stored data particularly described in Attachment B.

4.  I submit that there is probable cause to believe that evidence of Conspiracy to Distribute and Possess with Intent to Distribute Methamphetamine, in violation of 21 U.S.C § 841(a)(1), Distribution of Methamphetamine, in violation of 21 U.S.C § 841(a)(1), and Possession of a Firearm in Furtherance of a Drug Trafficking Offense, in violation of 18 U.S.C § 924(c)(1)(A)(i) will be found on the **Subject Devices**.

5.  The facts in this continuation come from my personal observations, my training and experience, and information obtained from other law enforcement officers, agents, and witnesses. This continuation is intended to show merely that there is probable cause for the requested search of the **Subject Devices** and does not set forth all of my knowledge about this matter.

## Probable Cause

6.  In the Spring of 2022, investigators with the Kalamazoo Valley Enforcement Team (KVET), Kalamazoo Department of Public Safety (KDPS) Crime Reduction Team (CRT), and DEA Kalamazoo Post of Duty (KPOD) began investigating Bryce SALTER and his involvement in the distribution of methamphetamine in southwest Michigan.

7.  Between June 20, 2022, and August 23, 2022, KVET investigators conducted 7 controlled purchases of methamphetamine from SALTER. The first two involved the use of a KVET Confidential Source[1] "CS" and a KVET Undercover

---

[1] KVET CS #2110 has conducted 9 successful controlled purchases of and provided information to investigators on over 80 different occasions. The information and controlled purchases have led to the seizures of controlled substances and illegal firearms. The information provided by this CS has been found to be credible and reliable. This

Officer "KVET UC", while the final 5 involved only the KVET UC. The controlled buys are summarized as follows:

    a.    6/20/2022 – Purchase of 4 ounces of methamphetamine for $740.

- DEA lab tested for 112.8 grams of 97% pure methamphetamine hydrochloride.

    b.    6/30/2022 – Purchase of 4 ounces of methamphetamine for $800.

- KDPS lab tested for 112.04 grams of methamphetamine

    c.    7/15/2022 – Purchase of 4 ounces of methamphetamine for $850.

- DEA lab tested for 102.8 grams of 97% pure methamphetamine hydrochloride.

    d.    7/20/2022 – Purchase of 6 ounces of methamphetamine for $1,300.

- DEA lab tested for 167.0 grams of 97% pure methamphetamine hydrochloride.

    e.    8/3/2022 – Purchase of 1 pound of methamphetamine for $3,000.

- Lab test pending; field tested positive.

    f.    8/9/2022 – Purchase of 4 ounces of methamphetamine for $875.

- Lab test pending; field tested positive.

    g.    8/23/2022 – Purchase of 4 ounces of methamphetamine for $850.

- Lab test pending; field tested positive.

---

CS was initially working with law enforcement for possible leinency on a pending case and is now working for monitary gain.

8. The controlled buys on 6/20/22, 6/30/2022, and 7/15/2022 were arranged by contacting SALTER by telephone at 269-501-5640.

9. Prior to the controlled buy on 7/20/22, SALTER and the KVET UC spoke by telephone and SALTER provided the KVET UC with a second phone number, 269-663-1308, which he described as his "business line." Subsequently, the controlled buys on 7/20/22, 8/3/22, 8/9/22 and 8/23/2022 were arranged by contacting SALTER by telephone at 269-663-1308.

10. As a result of the investigation and controlled buys, on August 25, 2022, investigators obtained Federal search warrants for two residences and a vehicle associated with SALTER and his methamphetamine trafficking.[2]

11. During a search of Subject Premises-1 (2717 Fairfield Ave, Kalamazoo, MI), SALTER was located, and **Subject Device 1** was seized from his person. In the south bedroom (Bedroom A), identified as belonging to SALTER and his girlfriend, Mackenzie MOORE, investigators located:

    a. Digital scale with methamphetamine residue on the closet shelf.

    b. **Subject Device 2** on the closet shelf.

    c. An undetermined amount of US currency in a pair on men's pants in the bedroom closet.

---

[2] 1:22-MJ-0172 "Subject premises-1" – 2717 Fairfield Ave, Kalamazoo, MI.
1:22-MJ-0173 "Subject Premises-2" – 4838 North 36th Street, Galesburg, MI.
1:22-MJ-0174 "Subject Vehicle" – black 2012 Chrysler 200, MI registration "EGS4809"

  d.  Two additional cell phones. MOORE admitted these were hers and provided investigators with consent to search which confirmed this.

12. During a search of Subject Premises-2 (4838 North 36th Street, Galesburg, MI), the residence of SALTER's father (Brandon) and SALTER's suspected "stash" house, investigators located:

  a.  Large of amount of US Currency in a safe in the basement.

  b.  Approximately 2.5 pounds of suspected methamphetamine in the basement.

  c.  Three digital scales with methamphetamine residue in the basement.

  d.  Packaging material in the form of various types of Ziploc/sandwich bags in the basement.

  e.  A Smith & Wesson, model SD9 VE, 9mm handgun in the basement.

  f.  Documents for Bryce SALTER, including old FedEx Ground earning statements in the basement.

13. Investigators seized the **Subject Devices** and secured them in the custody of the DEA and were later secured with the Kalamazoo Valley Enforcement Team in Kalamazoo, MI, on the same day.

14. Based on my training and experience, I know that drug traffickers frequently use more than one cell phone to conduct their drug trafficking business.

For example, I have encountered drug dealers that use one cell phone/phone number to communicate with their suppliers, and a separate cell phone/phone number to communicate with their customers.

15. Based upon my training, experience, and participation in drug investigations and financial investigations relating to drug investigations, I am aware of the following:

    a. Drug traffickers often keep names, aliases, and/or contact information of suppliers, purchasers, and others involved in drug trafficking in their devices.

    b. Drug traffickers sometimes use electronic messaging or messaging apps, in addition to MMS, SMS text messages, and voice call, to communicate with suppliers, purchasers, and others involved in drug trafficking on their devices.

    b. Drug traffickers often take pictures or videos of their drug trafficking associates, drugs, money and/or firearms, which they store on their devices.

    d. Global Position System (GPS) data on phones may show the location of a drug trafficker at a given time, which may provide corroborating evidence of a drug delivery or other instance of drug trafficking.

    e. It is common for persons involved in drug trafficking to maintain evidence pertaining to their obtaining, secreting, transfer, concealment and or expenditure of drug proceeds. This evidence includes currency, financial

instruments, records, invoices, receipts, records of real estate transactions, bank statements and related records, passbooks, money drafts, letters of credit, and records concerning storage lockers. These and other items are maintained by the drug traffickers within their residences or other locations over which they maintain dominion and control.

  f. That when drug traffickers amass large proceeds from the sale of controlled substances that the drug traffickers attempt to legitimize these profits through money laundering activities. To accomplish these goals, drug traffickers utilize but are not limited to, domestic and international banks and their attendant services, professionals such as attorneys and accountants, casinos, real estate, shell corporations and business fronts, storage lockers, safe deposit boxes and otherwise legitimate businesses that generate large quantities of currency.

  g. User attribution data and usernames, passwords, documents, and browsing history can provide evidence that the device is being used by a drug trafficker and can provide other useful evidence to the drug investigation; and

  h. Drug traffickers often use the internet to look up various information to support their drug trafficking activities.

### Technical Terms

16. Based on my training and experience, I use the following technical terms to convey the following meanings:

a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet. Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for

9

viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

      c.      Portable media player: A portable media player (or "MP3 Player" or iPod) is a handheld digital storage device designed primarily to store and play audio, video, or photographic files. However, a portable media player can also store other digital data. Some portable media players can use removable storage media. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can also store any digital data. Depending on the model, a portable media player may have the ability to store very large amounts of electronic data and may offer additional features such as a calendar, contact list, clock, or games.

      d.      GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from

at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

      e.    PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs.  Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail.  PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data.  Removable storage media include various types of flash memory cards or miniature hard drives.  This removable storage media can store any digital data.  Most PDAs run computer software, giving them many of the same capabilities as personal computers.  For example, PDA users can work with word-processing documents, spreadsheets, and presentations.  PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

      f.    IP Address: An internet protocol address (or simply "IP address") is a unique numeric address used by computers on the internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178).  Every computer attached to the internet must be assigned an IP address so that internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most internet service

11

providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

17. Based on my training, experience, and research, I know that the **Subject Devices** have capabilities that allows it to serve as a wireless telephone, digital camera, portable media player, GPS navigation device, and/or PDA. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device and other evidence of drug trafficking.

### Electronic Storage and Forensic Analysis

18. Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

19. *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the **Subject Devices** were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the **Subject Devices** because:

    a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a

deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

b.  Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c.  A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d.  The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.  Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

20. *Nature of examination.* Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the **Subject Devices** consistent with the warrant. The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

21. *Manner of execution.* Because this warrant seeks only permission to examine a device already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises. Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## CONCLUSION

22. I submit that this affidavit supports probable cause for a search warrant authorizing the examination of the **Subject Devices** described in Attachment A to seek the evidence of drug trafficking and weapons offenses described in Attachment B.